IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


---------------------------------------------------           :
LANA HAYES LEONARD, et al.                           : CASE NO.  1:03 CV 1838
                                                                       :
                                        Plaintiffs        :
                                                                       : <u>MEMORANDUM OF OPINION AND</u>
                    -vs-                                            : <u>ORDER GRANTING IN PART AND</u>
                                                                       : <u>DENYING IN PART DEFENDANTS'</u>
                                                                       : <u>MOTION FOR SUMMARY JUDGMENT</u>
DAVID A. COMPTON, et al.                             :
                                                                       :
                                        Defendants      :
---------------------------------------------------           :


UNITED STATES DISTRICT JUDGE LESLEY WELLS


        Plaintiff Lana Hayes Leonard filed this lawsuit, individually and on behalf of her two

minor children, against defendants David A. Compton, Robbie L. Durbin, and the City of

Cleveland based on an incident which occurred at her home on 5 October 2002.[1]   In her

complaint, Ms. Leonard raises a federal civil rights claim against all three defendants

(count one).  She also asserts intentional infliction of emotional distress claims on behalf of

her minor children against Cleveland Police Officers Compton and Durbin (counts four and

five), contends that the City of Cleveland bears *respondeat superior* liability on those two

state law claims (count two), and raises a negligent hiring, training, and/or supervision

claim against the City of Cleveland (count three).[2]

_____

        [1] Although Ms. Leonard's complaint also named Officer Edwin Smith as a defendant, Mr. Smith
was voluntarily dismissed on 8 September 2004.  (Docket #32).

        [2] Ms. Leonard also seeks punitive damages, a request she has characterized as count six.

This case is before the Court on defendants' motion for summary judgment on all of plaintiffs' claims.  (Docket #35).  Plaintiff has filed a brief in opposition and no reply has been filed.  (Docket #38).  For the reasons set forth below, defendants' motion for summary judgment is granted as to all claims asserted against the City of Cleveland and denied as to all claims asserted against Officers Durbin and Compton.

## I.  FACTUAL BACKGROUND

This case arose from the warrantless arrest of plaintiff Lana Hayes Leonard on 5 October 2002 by two Cleveland police officers attempting to enforce a visitation order issued to Ms. Leonard's estranged husband, Tyrone Hayes.  The arrest took place at Ms. Leonard's home, 2547 Belvoir Road, Cleveland, Ohio, where she resided with her two minor children, Ella (age 1) and Destiny (age 3), and her parents.  Although the Ms. Leonard and Mr. Hayes were still married at the time, the couple had not lived together for some time as Mr. Hayes had "walked out" on Ms. Leonard and the children about a year earlier.  (Leonard Dep. at 20).

On 5 October 2002, Tyrone Hayes went to the Cleveland police department and sought police assistance for effectuating a court order involving visitation rights.  Cleveland Police Officers Durbin and Compton were assigned to assist Tyrone Hayes in this matter. Officer Compton was still in his training period with the department and Officer Durbin was his field training officer that day.  In their marked police car, the officers followed Mr. Hayes to the Belvoir residence.  While Mr. Hayes waited by his car, the two uniformed officers approached the house, with Officer Durbin carrying the visitation papers, and knocked on

the door.  When Ms. Leonard answered the door, Officer Durbin informed her that they were there to "pick up her children."  (Durbin Dep. at 27).  As Ms. Leonard had apparently not been to court and had not received anything about Mr. Hayes' visitation rights in the mail, she asked to see the visitation papers.  Officer Durbin responded by telling her to let them into the house to talk about it, but Ms. Leonard refused and shut the door.

Ms. Leonard then called her cousin, Pamela Leonard who was a Detective with the Cleveland Police Department, and told her what had transpired.  Detective Leonard advised her to ask for the papers again and told her that she did not have to let them in the house.  Durbin called Lieutenant Patricia Seroka, informed her of the situation, and asked her about "getting a warrant for interference with custody."  (Durbin Dep. at 34).[3] Lieutenant Seroka confirmed that Ms. Leonard could be arrested for "obstruction or interference with custody" and that the officers "could arrest her, or have the warrant issued, or consult with the prosecutor to have the warrant issued."  (Durbin Dep. at 34 and 52-53).

At some point, Ms. Leonard observed Officer Durbin looking through a broken window in the rear of the house.  Officer Durbin again asked her to let them in and told her that she needed to speak with them.  Ms. Leonard told Officer Durbin that she had spoken with her cousin, the police detective, and that her cousin had told her not to open the door. Ms. Leonard also claims that she told Officer Durbin that she had not been to court to address any custody issues and that she had papers demonstrating her husband had

---

[3]  It is not entirely clear when in the sequence of events Officer Durbin spoke with Lieutenant Seroka.

3

been convicted of domestic violence.[4]  She further asserts that Officer Durbin attempted to enter the house through the back door but could not do so because the door, though unlocked, was secured by a chain.

After hearing more banging on the front door, Ms. Leonard opened the door again.[5] Officer Durbin told her that she was "interfering with custody" and that if she did not turn the children over he would "see the prosecutor about getting a warrant for her arrest."  (Durbin Dep. at 28).  At her deposition, Ms. Leonard testified as to what happened next:

> [Officer Durbin] turns like he's getting ready to leave.  He didn't turn completely away, he kind of turned, he turned around quickly and he smashes the screen door open.  My first reaction was to try to close the door.  I tried to close the door.  He stuck his foot in the way, so I couldn't close it.
>
> I turned to run.  He grabbed my wrist.  I believe it was my right wrist he grabbed.  I tried to pull away from him.  I guess we got maybe a few feet inside the house, he's calling for Officer Compton to come in and help him.
>
> Officer Compton, he was really reluctant.  He stood there watching.  He wasn't quick to come in, try to help him [sic].  Eventually he did come in.

(Leonard Dep. at 14-15).[6]  After a brief struggle during which all three individuals fell to the

---

[4]  Though Officer Durbin does not recall Ms. Leonard telling him about the domestic violence conviction at that time, he does remember her telling them about that in the police car.

[5]  Although Ms. Leonard and Officer Compton only testified to two interactions at the front door, Officer Durbin testified to a third intervening interaction.

[6]  The police officers' recollection of this portion of the incident was slightly different.  At his deposition, Officer Durbin stated:

> The final time I showed her the papers again, she's standing in the doorway.  I opened the screen door.  I grabbed her arm and said, you're under arrest for interference of custody. And when I grabbed her arm, she pulled back.  And when she pulled back, she pulled me into the house.

(Durbin Dep. at 37).  Officer Compton testified in his deposition that Officer Durbin told Ms. Leonard that he was going to place her under arrest for interference with custody and began to open the screen door.

4

ground, the officers handcuffed Ms. Leonard and escorted her out of the house.  Officer Compton then went in the house, got the children, and turned them over to Mr. Hayes.

With the children looking on, the officers carried Ms. Leonard to the police car and set her down in a large ditch by the car.  The officers then lifted her out of the ditch and pushed her into the car.  Ms. Leonard alleges that Officer Durbin hit her in the head with the door three times as he was trying to close it.[7]  Ms. Leonard was taken to the police station, detained overnight, and released the following day.[8]

## II. <u>STANDARD FOR SUMMARY JUDGMENT</u>

Summary judgment is appropriate if the evidence in the record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986).  However, where the nonmoving party has the burden of proof in a case, the moving party can satisfy its initial burden "by pointing out to the court that the

---

Compton explained that Ms. Leonard began screaming and tried to shut the interior door, but could not do so because Officer Durbin was holding one of her wrists.  As Ms. Leonard struggled to get away, Officer Durbin maintained his grip and was pulled into the house.

[7]  Although Officer Durbin did not specifically remember doing so, he agreed that it was possible the door hit Ms. Leonard's head when they closed it.

[8]  The officers actually took Ms. Leonard first to the Sixth District police station, then to the hospital to get insulin to treat her diabetes, and finally to the First District police station where she was booked, fingerprinted, and placed in a cell.

respondent, having had sufficient opportunity for discovery, has no evidence to support an

essential element of his or her case." Betkerur v. Aultman Hosp. Ass'n, 78 F.3d 1079,

1087 (6th Cir. 1996).

If the motion is properly made and supported as provided in Rule 56(c), the

nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.  It is not enough

for the nonmoving party to point to any alleged factual dispute between the parties.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)  To survive summary

judgment, the dispute must involve a genuine issue of material fact; that is, a fact that might

affect the outcome of the suit under the governing substantive law.  Anderson, 477 U.S. at

248 (noting that the "mere existence of a scintilla of evidence in support of the

[nonmovant]'s position will be insufficient; there must be evidence on which the jury could

reasonably find for the [nonmovant].")

Summary judgment is intended as a mechanism for isolating and disposing of

"factually unsupported claims or defenses."  Celotex, 477 U.S. at 323-24.  To that end, the

inquiry on summary judgment mirrors the directed verdict standard, and summary judgment

should be entered when "the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party." Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80

(quoting Matsushita Elec. Industrial Co., 475 U.S. 574, 587 (1986)).  If the non-moving

party bears the burden of proof at trial and fails to present "a jury question as to each

element of its case", the motion for summary judgment must be granted. Hartsel v. Keys,

6

87 F.3d 795, 799 (6th Cir. 1996) (citing Celotex, 477 U.S. at 322-23).  In considering a

motion for summary judgment, the evidence must be viewed in the light most favorable to

the party opposing the motion.  Matsushita, 475 U.S. at 587.

### III.  LAW AND ANALYSIS

Based on her arrest and treatment by Officers Durbin and Compton, Ms. Leonard

brings a federal Section 1983 claim against defendants Durbin, Compton, and the City of

Cleveland along with several state law claims, raised on her own behalf and on behalf of

her children.  In their motion for summary judgment, defendants seek the dismissal of each

of her claims.  The Court begins by addressing Ms. Leonard's federal claims and then

turns to her state claims.

**A.      Federal Claims**

To sustain a Section 1983 claim, Ms. Leonard must establish that she was

deprived of a right secured by the Constitution or laws of the United States, and that this

deprivation was caused by a person acting under the color of state law.  Flagg Bros. Inc. v.

Brooks, 436 U.S. 149, 155 (1978); Parratt v. Taylor, 451 U.S. 527, 535 (1981); Ellison v.

Garbarino, 48 F.3d 192, 194 (6th Cir. 1995).[9]

In this case, Ms. Leonard alleges that officers Compton and Durbin violated her

---

[9]  Section 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
any State . . . subjects, or causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the deprivation of any rights, privileges, or
immunities secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

Fourth Amendment right to be free from "a warrantless and non-consensual entry into a suspect's home in order to make a routine felony arrest."[10]  (Docket #38, at 4).  She also raises a <u>Monell</u> claim against the City of Cleveland based on its purportedly inadequate training "regarding the enforcement of Civil Domestic [Relations] Orders."  (Docket #38, at 9).  Defendants argue that they are not liable because the police officers are entitled to qualified immunity and because the "[o]ne lone incident of unconstitutional activity is not enough under <u>Monell</u> absent proof of an existing, unconstitutional policy" to establish liability for the City.  (Docket #35, at 8-10 and 14-15).

    1.    <u>Qualified Immunity Does Not Apply to Defendant Officers</u>

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Qualified immunity is not a defense to liability; where it is applicable, its purpose is to shield the official from suit altogether, saving him or her from the burdens of discovery and costs of trial.  <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526 (1985); <u>Skousen v. Brighton High School</u>, 305 F.3d 520, 526 (6th  Cir.  2002).

To determine if qualified immunity applies, this Court must engage in a two-step sequential analysis.  <u>Goad v. Mitchell</u>, 297 F.3d 497, 501 (6th Cir. 2002) (*citing* <u>Saucier v.</u>

---

[10]  Although Ms. Leonard also cites the Fifth, Eighth and Fourteenth Amendments in her complaint, she has not pursued any allegations that her fifth or eight amendment rights were violated and only references the Fourteenth Amendment to the extent that it makes the Fourth Amendment applicable to the States.

Katz, 533 U.S. 194, 201-202 (2001)); *see also* Fisher v. Harden, 398 F.3d 837, 842 (6th

Cir. 2005); Dunigan v. Noble, 390 F.3d 486, 491 (6th Cir. 2004).[11]  The initial inquiry

involves a determination of whether the facts, viewed in the light most favorable to the

plaintiffs, demonstrate the existence of a constitutional violation.  Saucier, 533 U.S. at 201.

 "[I]f a violation could be made out on a favorable view of the parties' submissions, the next

sequential step is to ask whether the right was clearly established."  Id.  The second step of

the analysis must be "undertaken in light of the specific context of the case, not as a broad

general proposition."[12]  Id.  If the facts, viewed in plaintiff's favor, demonstrate the violation

of a clearly established constitutional right, then qualified immunity is not proper.

### a. Constitutional Violation

The initial inquiry in determining whether qualified immunity applies is whether the

facts asserted, taken in a light most favorable to the plaintiffs, establish that a constitutional

violation occurred.  Saucier, 533 U.S. at 201.   In Payton v. New York, the United States

Supreme Court held that the Fourth Amendment of the United States Constitution prohibits

the police from making a warrantless nonconsensual entry into a suspect's home in order

to make a routine felony arrest. 445 U.S. 573, 576 (1980).  In articulating the underlying

concerns of the Fourth Amendment, the Supreme Court explained:

---

[11]  Although the defendants bear the initial burden of presenting facts that would establish the
officers were acting within the scope of their discretionary authority, *see* Wegener v. City of Covington, 933
F.2d 390, 392 (6th Cir. 1992), there is no dispute that defendants have satisfied this initial burden.

[12]  As explained in Dunigan, some panels of the Sixth Circuit continue to apply the three-step
analysis which pre-dated Saucier.  390 F.3d at 491 n.6.  For examples of panels taking the three-step
approach, *see* Beard v. Whitmore Lake School, 402 F.3d 598,  603 (6th Cir. 2005);  Feathers v. Aey, 319
F.3d 843, 848 (6th Cir. 2003).  Although the essence of the qualified immunity analysis is the same under
either approach, this Court adopts the approach of those panels which conduct the qualified immunity
analysis in two steps.

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence.  Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.

Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

Id. at 586, n.24 (quoting Johnson v. United States, 333 U.S. 10, 13-14 (1948)).

This basic constitutional principle remains on solid footing.  See e.g. New York v. Harris, 495 U.S. 14, 17-18 (1990); United States v. Williams, 354 F.3d 497, 502-503 (6th Cir. 2003); United States v. Rohrig, 98 F.3d 1506, 1513-14 (6th Cir. 1996); United States v. Morgan, 743 F.2d 1158, 1161 (6th Cir. 1984).  Although the Payton rule is subject to exceptions for exigent circumstances, Rohrig, 98 F.3d at 1515, defendants have not suggested that such circumstances were present in this case.[13]

Given the Fourth Amendment's proscription on warrantless nonconsensual arrests in a suspect's home and the absence of any exigent circumstances justifying a departure from that rule, Officers Durbin and Compton violated Ms. Leonard's constitutional rights. Viewing the facts in a light most favorable to Ms. Leonard, Officer Durbin arrested Ms.

---

[13]  Defendants bear the burden of establishing exigency.  Morgan, 743 F.2d at 1162.

10

Leonard by physically preventing her door from closing, grabbing her wrist and refusing to let go, forcing himself into her home where both officers ultimately subdued and handcuffed Ms. Leonard.  As there is no dispute that the officers lacked a warrant or that Ms. Leonard vigorously refused the officers entry into her home, the officers forcible entry and arrest violated Ms. Leonard's Fourth Amendment rights.[14]

### b.  The Constitutional Right At Issue Was Clearly Established

The threshold question of whether plaintiff demonstrated the existence of a constitutional violation "bleeds into" the determination of whether the constitutional right was clearly established.  Champion, 380 F.3d at 900.  For a constitutional right to be clearly established, "its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739 (2002).  A right can be clearly established even if there is no case involving "fundamentally similar" or "materially similar" facts.  Feathers, 319 F.3d at 850.  The determinative question is whether the particular officer had fair warning that his or her conduct deprived the plaintiff of a constitutional right.  Hope, 536 U.S. at 740-41.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier, 533 U.S. at 202.   In deciding whether a right is clearly established, this Court looks first to decisions of the Supreme Court, then to decisions within this Sixth Circuit, and finally to

---

[14]  Even if this Court were to credit defendants' version of the facts over Ms. Leonard's, the ultimate conclusion would remain unaltered.  Throwing open Ms. Leonard's screen door, reaching through her doorway, and grabbing her in attempt to effectuate an arrest likewise violates the constitutional rule set forth in Payton.

decisions from other circuits.  Beard, 402 F.3d 606-607.

Concluding that "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" and warrant procedures "minimize the danger of needless intrusions of that sort," the Supreme Court, in 1980, clearly established that, absent exigent circumstances, warrantless arrests inside the home violated the Fourth Amendment.  445 U.S. at 585.  This core constitutional principle has only become more firmly ingrained over time.  In 1984, the Sixth Circuit explained that the Fourth Amendment's "firm line at the entrance of the house" which cannot be crossed without a warrant absent exigent circumstances is "not a novel idea."  Morgan, 743 F.2d at 1161.  In 2002, a unanimous United States Supreme Court reiterated the existence of this firm line and reversed a Louisiana Court of Appeals ruling that exigent circumstances were not required to justify a warrantless arrest in a home.  Kirk v. Louisiana, 536 U.S. 635, 637-38 (2002).  Federal appellate courts have consistently concluded that this constitutional principle is clearly established.  See e.g. Tower v. Leslie-Brown, 326 F.3d 290, 296 (1st Cir. 2003); Loria v. Gorman, 306 F.3d 1271, 1286 (2nd Cir. 2002); Sharrar v. Felsing, 128 F.3d 810, 829 (3rd Cir. 1997).  Given the rule's longevity, consistency, and clarity, one would be hard-pressed to find a more clearly established constitutional right than the one violated in this case.

Notwithstanding the violation of a clearly established constitutional right, Officers Compton and Durbin would still be entitled to qualified immunity if a reasonable officer would not have known that their conduct was unlawful in the particular situation they confronted.  Relying on a two-part chain of command argument, defendants argue that both

12

officers should not be held responsible for their unconstitutional conduct because it was condoned and/or ordered by a superior officer.  Defendants first argue that Officer Compton's conduct was objectively reasonable because he was told by a superior officer, Lieutenant Seroka, that the warrantless arrest of Ms. Leonard was permissible.  Building on Seroka's alleged advice, they next contend that Officer Compton's actions were reasonable because he was merely following the orders of Officer Durbin, his superior officer, to enter the house and assist with the arrest.  The officers' attempt to shift the blame for their actions is unavailing.

As an initial matter, defendants' argument rests on a questionable factual basis. Although Officer Compton's deposition testimony could be read to suggest that Lieutenant Seroka told him that Leonard could be arrested without a warrant, there is no evidence that Seroka told Compton that he could enter Ms. Leonard's home to effectuate that warrantless arrest.

Even assuming that Lieutenant Seroka explicitly told Officer Compton that he could violate Ms. Leonard's clearly established constitutional rights by arresting her in her home without a warrant, that advice does not insulate Officer Compton from liability. A "reasonably competent public official should know the law governing his conduct." Harlow, 457 U.S. at 818-19.  Although supervisors may be liable under Section 1983 for the misconduct of an official he or she supervises if the supervisor condoned, encouraged, authorized, approved, or knowingly acquiesced to the unconstitutional conduct, Combs v. Wilkinson, 315 F.3d 548, 558 (6th Cir. 2002). Bass v. Robinson, 167 F.3d 1041, 1048 (6th Cir. 1999), defendants have not identified a single case to support their proposition that

13

reliance on a supervisor's advice absolves subordinates from liability for their own misconduct.  Just as an official policy does "not make reasonable a belief that was contrary to a decided body of case law,"  Wilson v. Layne, 526 U.S. 603, 617 (1999), police officers cannot obtain a license to violate clearly established constitutional rights from their superior officers.[15]  Accordingly, even if Officer Compton was relying on the advice of his superior officer in effectuating the warrantless arrest of Ms. Leonard in her home, his conduct was nonetheless objectively unreasonable in light of clearly established constitutional law.

Likewise, Officer Durbin may not avoid liability by simply arguing he was "following orders."  Although police officers may be able to rely on plausibly legal instructions, see e.g Varrone v. Bilotti, 123 F.3d 75, 81 (2nd Cir. 1997) (holding that subordinate officers who carried out "the apparently valid order" of a superior officer were entitled to have "the same qualified immunity that [the superior officer] had"), reliance on orders to violate clearly established constitutional rights is objectively unreasonable.  Cf. Raysor v. Port Authority, 768 F.2d 34, 38 (2nd Cir. 1985)

### c. Summary

By arresting Ms. Leonard in her home without a warrant and absent any exigent circumstances, Officers Compton and Durbin violated Ms. Leonard's clearly established Fourth Amendment rights.  Accordingly, they are not entitled to qualified immunity on

---

[15]  Instructions from a superior or fellow officer may be relevant to this Court's analysis to the extent that they suggest that "the necessary legal justifications for the actions exist." Bilida v. McCleod, 211 F.3d 166, 174-75 (1st Cir. 2000).  For example, if Officer Compton had been informed, albeit incorrectly, that a warrant had been issued for Ms. Leonard's arrest, Officer Compton's warrantless arrest may have been reasonable.  No such circumstances were present in this case.

14

plaintiffs' section 1983 claim.

      3.   <u>Defendant City of Cleveland Did Not Have a Policy or Custom Which</u>
          <u>Caused Plaintiff's Alleged Constitutional Injury</u>

      Because Section 1983 liability cannot be premised on a theory of *respondeat superior* or vicarious liability, a municipality can be found liable under Section 1983 only where the governmental entity itself causes the constitutional violation at issue.  <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690-91 and 694-95 (1978).  It is only when the "execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989); <u>Doe v. Claiborne County, Tenn. by and through Claiborne County Bd. of Educ.</u>, 103 F.3d 495, 507-508 (6th Cir. 1996) (explaining that there must be a direct causal link between the policy or custom and the constitutional injury).  In other words, a local governmental entity is liable under Section 1983 for its policies or customs that cause constitutional torts.  <u>McMillian v. Monroe County</u>, 520 U.S. 781, 788 (1997).  In this case, Ms. Leonard argues that the City of Cleveland should be held liable because its training regarding the enforcement of Civil Domestic Relations Orders was allegedly deficient and "directly related" to the plaintiffs' injury.  (Docket #38, at 8-9).

      It is by now well-established that a local governmental entity can be liable under Section 1983 for the failure to adequately train its employees.  <u>City of Canton</u>, 489 U.S. at 388-89 and 392; <u>Sova v. City of Mt. Pleasant</u>, 142 F.3d 898 (1998).  However, such liability only arises when the failure to train the employees evidences a deliberate indifference on the part of the city to the constitutional rights of its inhabitants and where

15

that failure is closely related to the ultimate injury.  City of Canton, 489 U.S. at 391-92.

Deliberate indifference in the failure to train context exists when there is an "obvious" need

for more or different training and the current inadequacy is "likely to result in the violation of

constitutional rights."  Id. at 390; Gray v. City of Detroit, 399 F.3d 612, 617-18 (6th Cir.

2005).  Deliberate indifference is a stringent standard of fault, requiring "proof that a

municipal actor disregarded a known or obvious consequence of his action."  Bd. of

County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 410 (1997).  A city's failure to

train is closely related to the ultimate injury when it can be demonstrated that the injury

could have been avoided if the employee had been trained "under a program that was not

deficient in the identified respect."  City of Canton, 489 U.S. at 391.  To establish a "failure

to train" claim, it is not enough to merely prove that a particular employee was

unsatisfactorily trained.  Id. at 390-91.

Plaintiffs' Section 1983 "failure to train" claim against the City of Cleveland lacks

merit.  As an initial matter, plaintiffs cannot simply rely on the constitutional violation itself to

make their "failure to train" case.  "That a plaintiff has suffered a deprivation of federal

rights at the hands of a municipal employee will not alone permit an inference of municipal

culpability and causation; the plaintiff will simply have shown that the *employee* acted

culpably." Brown, 520 U.S. at 406-407.  In other words, this Court may not assume, based

solely on the unlawful seizure, that the City of Cleveland had an inadequate training

program that demonstrated deliberate indifference on its part to the constitutional rights of

individuals like Ms. Leonard or that the failure to train caused her injury.

Other than relying on the constitutional violation itself to establish the existence of

16

inadequate training, plaintiffs have presented no evidence to suggest that the City of
Cleveland disregarded an obvious need for training or that such disregard culminated with
Ms. Leonard's injury.  Although plaintiffs argue that the City of Cleveland has failed to
properly train officers on the enforcement of Civil Domestic Relations Orders, they have not
pointed to any evidence in the record which actually demonstrates whether or not the City
of Cleveland specifically conducts training on this issue.[16]  Even assuming that the City of
Cleveland provides no specific training on this issue, plaintiffs' claim would still fail as they
have provided nothing to suggest that the failure to conduct training in this area constitutes
a deliberate choice to disregard an obvious risk of constitutional violations.  On the
contrary, the evidence in this case does not suggest the need for such training to avoid the
constitutional injury suffered by Ms. Leonard.  Indeed, Officer Durbin testified that this
incident was the first time in his ten-year career that he arrested someone when
effectuating a parent's court-ordered visitation rights. (Durbin Dep. at 38-40).

Finally, even assuming a deliberate indifference to training regarding the
enforcement of domestic relations orders, plaintiffs' Monell claim still fails because such
training lapses were not the moving force behind the constitutional injury in this case.  Ms.
Leonard's constitutional rights were not violated because the officers did not know how to
handle domestic relations orders.  Rather, her rights were violated because the officers
apparently were unaware of or consciously disregarded the Fourth Amendment's

---

[16]  Plaintiffs merely present testimony from one of the officers involved in the incident that he did
not think that the City of Cleveland had a "policy *per se*" regarding the enforcement of domestic relations
orders.  Such ambiguous testimony about the existence of some generic policy does not address whether
and to what extent Cleveland police officers are trained with respect to enforcing such orders.

prohibition on warrantless arrests in the home absent exigent circumstances.[17]  While it was the domestic relations order which brought the officers to Ms. Leonard's home, their knowledge, or lack thereof, regarding the enforcement of such orders could not be described as closely related to the constitutional violation in this case.

Because plaintiffs have failed to provide sufficient evidence that the City of Cleveland's deliberate indifference to an obvious need for training led to Ms. Leonard's constitutional injury, the City of Cleveland is entitled to summary judgment on plaintiffs' Section 1983 claim.

## B.    State Claims

In addition to her federal Section 1983 claim (count one), plaintiffs also asserts three state claims:  1) Ms. Leonard, individually, raises a negligent hiring, training and/or supervision claim against the City of Cleveland (count three); 2) Ms. Leonard, as mother and guardian of Destiny Hayes, raises an intentional infliction of emotional distress claim against all three defendants (counts two and four); and 3) Ms. Leonard, as mother and guardian of Destiny Hayes, raises an intentional infliction of emotional distress claim against all three defendants (counts two and five).[18]

---

[17]  Plaintiffs have not advanced an argument that the City of Cleveland should be held liable due to its failure to train its officers on limitations related to warrantless arrests in a person's home.  Accordingly, this Court does not address that issue.

[18]  Count two is not really a separate claim but rather consists of allegations regarding the City of Cleveland's alleged *respondeat superior* liability for the actions of the defendant officers.  Because, as discussed above, such vicarious liability does not apply to Section 1983 actions, this Court construes this "claim" as an attempt to hold the City of Cleveland liable for the officers' purported violations of state law (counts four and five).  Moreover, plaintiffs' "count six" constitutes a request for punitive damages and is not a separate cause of action.

1.  <u>Negligent Hiring, Training, and Supervision Claim against the City of Cleveland</u>

Defendant City of Cleveland contends that it is statutorily immune from plaintiff's state law claim related to the negligent operation of its Cleveland Police Division. Because plaintiff neither responds to this argument nor pursues this state law claim in its opposition brief, this claim is deemed abandoned and will be dismissed.

2.  <u>Intentional Infliction of Emotional Distress</u>

Ms. Leonard brings intentional infliction of emotional distress claims on behalf of both of her minor children.[19]  To prevail on their claims for intentional infliction of emotional distress, plaintiffs must prove: (1) that defendant officers intended to or recklessly caused Ella and Destiny serious emotional distress, (2) that defendant officers' conduct was extreme and outrageous, and (3) that defendant officers' conduct was the proximate cause of the minor children's serious emotional distress.  <u>Phung v. Waste Mgt., Inc.</u>, 71 Ohio St.3d 408, 410 (1994); <u>Yeager v. Local Union 20</u>, 6 Ohio St. 3d 369, 374 (1983).  Serious emotional distress means an emotional injury that is both severe and debilitating.  <u>Ekstrom v. Cuyahoga Cty. Community College</u>, 150 Ohio App. 3d 169, 182 (Ohio App. 2002).  The Ohio Supreme Court has explained that "extreme and outrageous" conduct is found only "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Yeager</u>, 6 Ohio St. 3d at 374-75.  Under Ohio law,

---

[19]  Although neither plaintiffs' complaint nor their brief clearly states whether their claim is based on negligent or intentional infliction of emotional distress, this Court construes it as an intentional infliction of emotional distress claim because any claim based solely on negligence would likely be barred by the operation of statutory immunity.  *See* O.R.C. § 2744.03(A)(6).

however, there is no requirement that intentionally inflicted emotional distress operate as a derivative claim of another tort or that the emotional distress manifest itself in the form of some physical injury. Id. at 374.

Defendants argue both that they are statutorily immune from such claims and that Ella's emotional distress claim fails because no expert report has been provided documenting her emotional injury.[20]

### a. Statutory Immunity for Defendant Officers

Defendant officers' state law statutory immunity argument is entirely predicated on the assumption that Officers Durbin and Compton were entitled to qualified immunity on plaintiffs' federal Section 1983 claims.  Specifically, they contend:

> If Defendants Durbin and Compton are granted this qualified immunity, as a matter of law and undisputed fact . . . they are entitled to immunity from Plaintiffs Destiny and Ella's state claims under Ohio Revised Code section 2744.03.

(Docket #35, at 11).  Because this Court concluded that the officers were not entitled to qualified immunity, defendants statutory immunity argument is based on a faulty premise and is therefore unpersuasive.

### b. Statutory Immunity for Defendant City of Cleveland

In their complaint, plaintiffs seek to hold defendant City of Cleveland responsible for the purported emotional distress which was intentionally inflicted on Ms. Leonard's minor

---

[20] Citing several negligent infliction of emotional distress cases, defendants also suggest that Ella's claim fails because she was not a bystander to the events and had no appreciation of the peril that took place.  However, as plaintiffs' claims were construed as intentional infliction of emotional distress claims, defendants' "bystander" and "appreciation of peril" arguments lack merit because those elements do not apply to claims for intentional infliction of emotional distress.

children.  Their attempt to do so, however, fails due to the operation of statutory immunity

for political subdivisions.

Under Ohio law, courts engage in a three stage analysis in determining whether a

political subdivision is immune from liability.  Cater v. City of Cleveland, 83 Ohio St.3d 24,

28 (1998); Butler v. Jordan, 92 Ohio St.3d 354, 357 (2001).  First, Ohio R.C. §

2744.02(A)(1) sets out the general rule of immunity providing, in pertinent part:

> Except as provided in division (B) of this section, a political subdivision is
> not liable in damages in a civil action for injury, death, or loss to person or
> property allegedly caused by any act or omission of the political subdivision
> or an employee of the political subdivision in connection with a governmental
> or proprietary function.

Cater, 83 Ohio St.3d at 28.  If immunity is established under Section 2744.02(A)(1), courts

next consider whether any of the five exceptions set forth in subsection (B) apply.  Id.  Even

if an exception is found applicable, immunity can still be reinstated if the political

subdivision can successfully argue that one of the defenses contained in Section 2744.03

applies.  Id.

In this case, it is undisputed that the City of Cleveland is a political subdivision

enjoying immunity pursuant to Section 2744.02(A)(1) and that the actions by defendant

officers fall within the rubric of governmental functions. O.R.C. § 2744.01(C)(2)(a) and (F).

As plaintiffs do not suggest and this Court does not find any of the five statutory immunity

exceptions to be applicable, the City of Cleveland cannot be held liable, under state law,

21

for the officers' conduct.[21]  Accordingly, the City of Cleveland is immune from liability on plaintiffs' intentional infliction of emotional distress claims.

>           *c.  Ella's Emotional Injury*

In addition to their statutory immunity arguments, defendants argue that Ella's claim for emotional distress must be dismissed because no expert report has been produced demonstrating that Ella suffered an emotional injury.  As Ella was only eleven months at the time of the incident and, according to her mother, too young "to get any type of psychological treatment," the only evidence in the record regarding an emotional injury suffered by Ella came from her mother's testimony regarding her own observations:

> Initially I tried to get Ella – I wanted to be counseled on how to deal with her change in behavior.  There was a definite change in behavior.  I would describe my child before this incident as very cheerful, very pleasant, trusting.  She would pretty much go to anybody.
>
> After the incident, she was crying all the time.  She was very unhappy.  I would go to school, when I came back, my mother would tell me that Ella had hit her.  Ella was just very difficult to deal with, so far as crying.

(Leonard Dep. at 40-41).  Because, as explained below, Ohio law does not require an expert report under the circumstances of this case, Ms. Leonard's lay testimony regarding the effect of the incident on her daughter's emotional well-being is sufficient to create a triable issue of fact which should be presented to the jury.

---

[21]  Ohio courts have consistently held that, with respect to governmental functions, political subdivision's retain their "cloak of immunity" from intentional tort claims based on the conduct of its employees.  Hubbard v. Canton City School Bd. of Educ., 97 Ohio St. 3d 451, 452 (2002) (finding no exception to immunity for intentional infliction of emotional distress claim); Wilson v. Stark Cty. Dept. of Human Servs., 70 Ohio St. 3d 450, 452 (1994); Ziegler v. Mahoning Cty. Sheriff's Dept., 137 Ohio App. 3d 831, 836-37 (2001).

Defendants' suggestion that an expert report is fundamentally necessary to prevail on an emotional distress claim finds no support in Ohio law.[22]   While expert testimony may indeed prove useful in establishing the existence of a serious emotional injury, it is not indispensable to an emotional distress claim.  Paugh v. Hanks, 6 Ohio St. 3d 72, 80 (1983).  Lay witnesses acquainted with the plaintiff "may testify as to any marked changes in the habitual or emotional makeup" that they observe after the incident giving rise to the claim.[23]  Id.  Moreover, just as expert testimony is not required to prove the existence of an emotional injury, "expert medical testimony is not essential to forge the causal link between a traumatic event and the alleged serious emotional distress."  Foster v. McDevitt, 31 Ohio App. 3d 237, 239 (1986); see also Paugh, 6 Ohio St. 3d at 80; Allen v. Lee, 43 Ohio App. 3d 31, 34 (1987).  Although some Ohio courts have required expert testimony to prove causation where there are multiple potential causes of plaintiff's alleged emotional injury and those causes are "inextricably related," see e.g. Powell, 148 Ohio App. 3d at 8 (expert testimony needed to differentiate the emotional impact caused by the death of plaintiffs' mother and her post-mortem injuries),[24] or where the alleged injury is linked to "more subtle

---

[22]  Defendants do not cite a single case to support the proposition that Ella's claim must be dismissed due to the absence of an expert report.

[23]  Although Paugh involved a claim for negligent infliction of emotional distress, Ohio courts have consistently held, with respect to both negligent and intentional infliction of emotional distress, that expert testimony, though useful, is not indispensable.  Buckman-Pierson v. Brannon, 159 Ohio App. 3d 12, 23 (2004) (second district); Powell v. Grant Med. Ctr., 148 Ohio App. 3d 1, 6-7 (2002) (tenth district); Motley v. Flowers & Versagi Court Reporters, 1997 WL 767466, *4 (Ohio Ct. App. Dec. 11, 1997) (eighth district); Oswald v. Fresh Market/Sugardale, Inc., 1992 WL 330282, *3-4 (Ohio Ct. App. Nov. 9, 1992) (fifth district); Ueblacker v. Cincom Systems, Inc., 48 Ohio App. 3d 268, 276 (1988) (first district); Criss v. Springfield Tp., 1988 WL 61055, *4-5 (Ohio Ct. App. Jun. 8, 1988) (ninth district).

[24]  But see Endres Floral Co. v. Endres, 1995 WL 156411 (Ohio Ct. App. Feb. 9, 1995) (concluding that a jury could decide, without the aid of expert testimony, whether and to what extent emotional injury was caused by wrongful termination as opposed to plaintiff's health problems).

or less discrete stimulus" outside the competence of most jurors, see e.g. Grote v. J.S. Mayer & Co., Inc., 59 Ohio App. 3d 44, 47-48 (1990) (expert testimony required where the alleged emotional injury "is inextricably interrelated to the rendition of professional psychological services"); Dickerson v. Int'l United Auto Workers Union, 98 Ohio App. 3d 171, 185-87 (1994) (expert testimony needed to prove that emotional injury was caused by the "sweeping and continuing disruption of their lives due to overwhelming fear of the union"), defendants have not advanced any arguments regarding causation and nothing in the record suggests causation issues akin to those in Powell, Grote, or Dickerson.

Viewing the evidence in a light most favorable to the plaintiffs, Ella's claim for intentional infliction of emotional distress survives summary judgment. As she did in her deposition, Ella's mother may testify about "marked changes" in Ella's "habitual and emotional makeup" as a result of the officers' conduct in this case. Moreover, given that the emotional injury flowed from a single, concrete incident, jurors can "refer to their own experiences in order to determine whether, and to what extent, the defendant's conduct caused the emotional distress." Paugh, 6 Ohio St. at 80.

### d. Summary Regarding Intentional Infliction of Emotional Distress Claims

Because defendants have failed to establish that Officers Compton and Durbin are entitled to statutory immunity and because genuine issues of material fact remain on the merits of Destiny and Ella Hayes' intentional infliction of emotional distress claims, summary judgment as to claims against the officers (counts four and five) is improper. However, because the City of Cleveland is statutorily immune from liability for the alleged tortious conduct of the police officers, plaintiffs' intentional infliction of emotional distress

claims, asserted through count two, will be dismissed as to the City of Cleveland.

## IV.  **CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part.  Because plaintiffs have failed to demonstrate a basis for holding the City of Cleveland liable on either their federal or state claims, the City of Cleveland is dismissed from this case.  However, plaintiffs' claims against Officers Compton and Durbin (counts one, four, and five) survive summary judgment.[25]

IT IS SO ORDERED.

        /s/ Lesley Wells
UNITED STATES DISTRICT JUDGE

Dated: <u>17 June 2005</u>

---

[25]  As defendants have not suggested any bar to the recovery of punitive damages as a matter of law, that issue (delineated as "count six") remains to be decided as well.

25